UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

UNITED STATES OF AMERICA,

        -against-                                20-cr-366 (NSR)

TYLER ALLEN,

           Defendant.

-------------------------------------------------------------X


Memorandum of Law in Support of Motion to Dismiss Indictment


Theodore S. Green
*Attorney for Tyler Allen*
Green & Willstatter
200 Mamaroneck Avenue - Suite 605
White Plains, New York   10601
(914) 948-5656
theosgreen@msn.com

cc: All counsel (by ECF)

This memorandum of law is submitted in support of Tyler Allen's motion to dismiss the indictment under the Jury Selection and Service Act of 1968, 28 U.S.C. §1861, et seq. (hereinafter "JSSA"), under the Sixth Amendment right to a grand jury drawn from a fair cross section of the community and under the Equal Protection Clause of the Fifth Amendment.

The defendant submits that the wheel the grand jury was drawn from was not a "fair cross section of the community" as guaranteed by the Sixth Amendment and the JSSA. It also violated the Equal Protection Clause of the Fifth Amendment. Systematic features of the Jury Plan led to underrepresentation of Black or African-American and Hispanic or Latino persons. Further, in significant respects, the White Plains jury wheels were not constructed in accordance with the Jury Plan, resulting in more systematic exclusion of Black or African-American and Hispanic or Latino persons as well as in the arbitrary exclusion of over 400,000 persons total.

## I.    Statement of Facts

### a.    Procedural History of Mr. Allen's case

On May 26, 2020, Allen was presented (by remote electronic conferencing) upon a complaint before a United States Magistrate Judge sitting in White Plains, which alleged an offense committed in Westchester County.   Following a hearing, he was ordered detained.   An indictment was filed on or about July 20, 2020, accusing Allen of conspiracy to commit Hobbs Act robbery, 18 U.S.C. §1951.   Allen is a black male who was 21 years old when the indictment was returned.   On information and belief, the indictment was returned by a grand jury sitting in the White Plains division of the Southern District of New York.   Following the indictment and prior to his arraignment thereon, Allen filed a motion to direct that the Clerk of the Court of the Southern District of New York provide the defense with records related to the composition of the Grand and

Petit Jury venires used (and to the extent presently known, to be used) in this case. In response to that motion the government, on or about September 25, 2020, produced records to the defense. I am advised by the government that the records provided were also provided by the government to the defendant in *United States v. Balde*, 20-cr-281 (KPF) in connection with a similar motion, and involve the same grand jury.

Allen was arraigned on the indictment on August 3, 2020, and the case was assigned to Hon. Nelson S. Román in White Plains.

**b.  SDNY's Jury Plan**

The JSSA mandates that each federal district court "devise and place in operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). In 2009, the Southern District of New York set forth its plan to determine the selection of petit and grand jurors in The Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York. (hereinafter "Jury Plan"). https://nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf

The Southern District's Jury Plan uses voter registration lists as the exclusive source of names of prospective jurors. Id., Art. III.A; *United States v. Biaggi*, 909 F.2d 662 (2d Cir. 1990) (examining previous jury plan). From these names, two master jury wheels are constructed: one for the Manhattan courthouse and one for the White Plains courthouse. The plan states that to fill the master wheels, jurors are to be drawn from each county's voter registration list. For each county, the proportion of jurors drawn should be the same as the proportion as that county's number of registered voters bears to the total number of registered voters for all of the counties in the respective wheels. Jury Plan, III.A.1, III.B.

2

The Manhattan master wheel (also called the Foley Square Division) contains names drawn from New York, Bronx, Westchester, Putnam, and Rockland. The White Plains master wheel contains names from Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess counties. For the three overlapping counties (Westchester, Putnam and Rockland), the names are to be apportioned among the two master wheels so as to "reasonably reflect the relative number of registered voters of each county" within the respective wheels. Jury Plan, Art. IV.B. According to the Jury Plan, the "master jury wheels shall be emptied and refilled by not later than September 1 following the date of each Presidential Election." Id., Art. III.B; *see also United States v. Reyes*, 934 F.Supp. 553 (S.D.N.Y 1996). At least once a year, names are drawn randomly from the master jury wheels in an amount sufficient to meet the anticipated demand for jurors for the next six months. Jury Plan, Art. III.D. These people are sent questionnaires to determine their qualifications to sit as jurors. Id. Potential jurors are instructed to complete the questionnaire and return it within ten days. Id. Art. III.E. The names of persons who complete and return the questionnaire (and who are found to be qualified as jurors) comprise the qualified jury wheels. Id., Art. III.C. As with the master wheels, two separate qualified jury wheels are maintained: one for Foley Square and one for White Plains. When jurors are needed, names are drawn at random from these wheels. Summonses are sent to those whose names are drawn. Id., Art. IV.C; *Reyes*, supra at 556.

c.      **The Analysis of the Demographic Composition in the Qualified Jury Wheels for the Southern District of New York 2017 to Present**

In the *Balde* case, jury composition expert Jeffrey O'Neal Martin reviewed the construction and implementation of the Master Jury Wheel and Qualified Jury Wheel utilized in this case and also analyzed the racial and ethnic composition of those wheels. Mr. Martin's full analysis is contained

in the Declaration of Jeffrey Martin, attached as Exhibit A.

Mr. Martin concludes that there is significant underrepresentation of Black or African-American and Hispanic or Latino persons within the Qualified Jury Wheel for the White Plains Division. As illustrated in the Table below, the jury eligible population for the Southern District of New York is 18.09% Black or African-American and 23.41% Hispanic or Latino. Ex. A,  19. The jury eligible population for the Manhattan Division is 20.92% Black or African-American and 28.06% Hispanic or Latino. Id.,  20. And the jury eligible population for the White Plains Division is 12.45% Black or African-American and 14.12% Hispanic or Latino. Id., 21.

The Qualified Jury Wheel from which Allen's grand jury was picked was last refilled on February 17, 2017. The demographic data provided by the Form AO-12 reports indicates that the wheel was 8.76% Black or African- American and 10.48% Hispanic or Latino. Ex. A.,  55.  As discussed more fully below, Black or African-American and Hispanic or Latino persons are significantly underrepresented within the White Plains wheel regardless of what method of statistical analysis is used.

Mr. Martin discovered that the structure of the Jury Plan systematically leads to underrepresentation for several reasons. First, the Jury Plan draws exclusively from voter registration rolls, which underrepresent the total jury eligible population of Black and Hispanic persons. Ex. A,  79. Additionally, by replenishing the Master wheels only once every four years, younger eligible jurors and those who move within the division are excluded towards the end of the life of the wheel. Ex. A,  12-13. Black or African-American and Hispanic or Latino persons are disproportionately represented in age groups 18, 19 and 20. Id.,  48-51. The four- year replenishment also disproportionately excludes persons who may have changed addresses within those four years. Black

4

or African-American and Hispanic or Latino persons move at a higher rate and are therefore disproportionately affected. Id., 52.

Mr. Martin also found several substantial failures to comply with the Jury Plan. Some of these failures, such as improper apportionment among counties and exclusion of inactive voters, result in further underrepresentation of Black or African-American and Hispanic or Latino persons in the wheel and others arbitrarily exclude eligible people from jury service. All told 459,796 persons were wrongly excluded due to a failure to properly implement and follow the Jury Plan. Ex. A, 45.

## II.      Legal Basis for Grand Jury Challenge

The challenge brought on behalf of Allen is based on violations of several interconnected areas of the law. Because the same definitions and the same statistical analysis of the jury data is utilized for all of our arguments, the legal basis for each challenge will be explained first and then the data will be discussed in the context of these challenges second.

### a.  Sixth Amendment Challenge

The Sixth Amendment guarantees a criminal defendant a grand jury selected from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530, (1975). Allen's right under the Sixth Amendment to a grand jury drawn from a fair cross-section of the community applies to the grand jury that indicted him. *See, e.g., United States v. Osorio*, 801 F. Supp. 966, 973-74 (D. Conn. 1992).

In *Duren v. Missouri*, the Supreme Court set forth the three elements that must be shown to establish a prima facie violation of the fair-cross-section requirement: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such

persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process. 439 U.S. 357, 364 (1979).

"[A] jury selection system yielding a significant underrepresentation of a minority group in jury venires can violate the "fair cross-section" requirement of the Sixth Amendment, even if proof of discriminatory intent necessary for a Fifth Amendment violation is absent. *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990), *citing Duren*, 439 U.S. at 368 n.26.

### i.      First prong of *Duren* - distinctive group

Blacks or African-Americans and Hispanics or Latinos are "distinctive" groups in the community, and a claim of under representation of those groups meets the first prong of a fair- cross section claim. *United States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995).

### ii.      Second Prong of *Duren* - significant underrepresentation

In considering the second *Duren* element, the Court must determine "whether either or both of these two 'distinctive' groups are 'significant[ly] underrepresent[ed]' in the jury selection process." Id. (*citing United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir.1990) cert. denied, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991)). The relevant comparison, for purposes of assessing the representativeness of the system, is between the number of minority persons in the population and the number of persons belonging to the class found in the jury pool. Id. (citing *Duren*, 439 U.S. at 365-66). As constituted, the qualified jury wheels are a proper measure for evaluating the degree of underrepresentation as compared to the relevant community. *United States v. Rioux*, 97 F.3d 648, 655-56 (2d Cir. 1996)

While *Duren* itself did not define what community is relevant for a fair cross-section analysis, it is widely understood to mean "the district or division where the trial will be held." *United*

*States v. Johnson*, 21 F.Supp.2d 329, 334-5 (S.D.N.Y. 1998); *see also United States v. Kenny*, 883 F.Supp. 869, 874 (E.D.N.Y. 1995).  Allen's case is assigned to the White Plains division.

Over the years, the Second Circuit has utilized various statistical models for evaluating claims of "significant underrepresentation." In *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996), the Circuit reviewed the three most common models. Statistical decision theory ("SDT") calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance. Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is imperfection in the jury selection system. "The intellectual core of SDT is random selection." Id.

The absolute disparity method measures the difference between the group's representation in the general population and the group's representation in the qualified wheel. For example, if Blacks or African-Americans compose 10% of the entire population but only 2% of the qualified wheel, the absolute disparity is 8%. The "absolute numbers" approach is the average difference in the number of jurors per venire due to the underrepresentation. *Rioux*, 97 F.3d at 655.

Finally, the comparative disparity method "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." Id. at 655 (internal citations omitted). Comparative disparity is calculated by dividing the absolute disparity of a group by the group's percentage of the population and then multiplying by 100%. Id.

In this case, there is significant underrepresentation of both Black or African-American and Hispanic or Latino persons, regardless of the method of comparison utilized.

Turning first to the absolute disparity analysis, Black or African-American persons are

20.92% of the eligible juror population in Manhattan but only 8.76% of the White Plains qualified wheel. That is an absolute disparity of 12.16%. Ex. A,  61. Hispanic or Latino persons are 28.06% of the eligible juror population in Manhattan but only 10.48% of the White Plains qualified wheel. That is an absolute disparity of 17.58%. Ex. A,  62.

A comparative analysis of the data puts the disparity in context. Using the jury eligible population of the Manhattan Division again as the appropriate community, the Comparative disparity of Black or African American persons is 58.13% and the Comparative disparity of Hispanic or Latino persons is 62.66. Ex. A,  69, 70. These numbers mean that well over half of the Black or African-Americans and Hispanic or Latino persons who would be expected to be in the wheel were absent.

Significant underrepresentation is still present even if the White Plains qualified wheel is compared to the entire Southern District of New York. Compared to the eligible population of the entire Southern District, Black or African-American persons are underrepresented in absolute terms by 9.33%. Ex. A,  59. Hispanic or Latino persons are underrepresented by 12.93%. Id.,  60. Utilizing a comparative analysis Black or African-American persons are underrepresented by 51.58%. Id.,  67. Hispanic or Latino persons are comparatively underrepresented by 55.23%. Id.,  68.

Even if one were to compare the White Plains qualified wheel to only the eligible jury population within the White Plains Division, the underrepresentation is significant. Absolute underrepresentation of Black or African-American persons is 3.69%. Ex. A.,  63. Comparative underrepresentation of Black or African-American persons is 29.63%. Id.,  71. Essentially, somewhere between a quarter and a third of the Black of African-American persons who should in

the qualified wheel are missing. Absolute underrepresentation of Hispanic of Latino persons is 3.64%. Id.,  64. Comparative underrepresentation is 25.80%. Id.,  72. Meaning one quarter of the Hispanic of Latino person who would be expected to be in the qualified wheel are missing.

Notably, the absolute disparity reflected in the data is similar to the disparity which the Second Circuit found troubling in *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir.1990). In *Biaggi*, the absolute disparity for Black or African-American persons was 3.6% and for Hispanic or Latino person was 4.7%. In affirming the district court's denial of the Sixth Amendment challenge, the Circuit noted that "the facts of this case press the . . . "'absolute numbers' approach to its limit, and would find the Sixth Amendment issue extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists." Id. As explained below, there are several other errors present in the formation of the White Plains Qualified Wheel, which exacerbate the problem of exclusively relying on voter lists.

Lastly, utilizing the third analysis method discussed in *Rioux*, the statistical decision theory ("SDT") or Standard Deviation analysis reveals that the underrepresentation of Black or African-American persons and Hispanic or Latino persons is significant and systematic. When utilizing the Standard Deviation analysis, Mr. Martin found that regardless of whether the qualified wheel was compared to the Manhattan Division, the entire Southern District or the White Plains Division, the underrepresentation of both Black or African-American persons and Hispanic or Latino persons "is not the result of random factors, chance, or luck, but is the result of a systematic practice that underrepresents [those distinctive groups]." Ex. A,  74, 75.

### iii.      Third prong of *Duren* - Systematic Exclusion

As it relates to the third *Duren* prong, to prove "systematic exclusion," a party need only establish that the underrepresentation is due to the systematic exclusion of a cognizable group during the jury selection processes, not that the system intentionally discriminates against any particular group, as required by an Equal Protection claim. *United States v. Biaggi*, 909 F.2d 662, 677 (2d Cir. 1990). As described above, no matter which population is used as the proper comparison, there is significant underrepresentation of Black or African-American and Hispanic or Latino people in violation of the Sixth Amendment.

The proper "community" to which the White Plains Qualified Wheel data should be compared is the community in which the trial will be held: that of the Southern District of New York, or barring that, the White Plains Division. In both instances, the primary reason for the significant under representation of Black and African-American and Hispanic or Latino people is the choice to pursue an indictment from a grand jury drawn from the northern counties, as opposed to the district as a whole. This decision resulted in the systematic exclusion of eligible jurors residing in the southern counties of the Southern District of New York, including a much higher percentage of Black and Latino people as compared to the northern counties. The use of the White Plains Division systematically excluded Black and Latino people by an exceedingly significant margin, thereby violating Allen's Fifth and Sixth Amendment rights to a grand jury drawn from a fair cross-section of the community. *See United States v. Jackman*, 46 F.3d 1240 (2d Cir. 1995) (finding fair cross-section violation due to exclusion of Hartford and New Britain residents).

But should the Court determine that the proper comparison "community" is the White Plains Division, there are still systematic reasons for the significant levels of underrepresentation of Black

or African-American and Hispanic or Latino people. Indeed, there are several: the decision to refill the jury wheel only every four years, (and the failure to update addresses or re-mail juror questionnaires following a lack of return), the exclusive reliance on voter registration lists as the sole source of jurors, the exclusion of inactive voters from Orange, Putnam, Rockland, Sullivan and Westchester counties, and the process of excluding thousands of people from Putnam, Rockland and Westchester counties due to incorrect proration. Ex. A, 76-82, 85-89.

By refilling the wheels once every four years, people's addresses become stale, and more "undeliverable" questionnaires are created. "Undeliverable" questionnaires are questionnaires that are sent to potential jurors, but are returned by the post office as "undeliverable" because the address is incorrect or out-of-date. This rate could be reduced if the wheel were refilled more frequently. Similarly, the rate of nonresponses, i.e., questionnaires that are simply not returned, possibly because they did not reach the recipient, could be reduced by a more up-to-date set of addresses. Registered voters who have moved but remain in the division should have a fair opportunity to receive a qualification questionnaire.

Persons excluded due to undeliverable and nonresponsive questionnaires further underrepresent Black and Latino people. Ex. A, 88-89. Because the addresses are not updated, and no new attempt to mail the questionnaires is made, the decision to refill the wheel every four years has a systematic effect of excluding potential Black and Latino jurors.

Other district courts in large urban areas around the country have jury plans that require re-filling the wheels more frequently than every four years: the Eastern District of New York,[1] the

---

[1]Jury Selection Plan (amended Oct. 30, 2006),
https://img.nyed.uscourts.gov/files/local_rules/juryplan.pdf

11

Northern District of Illinois,[2] the Southern District of Florida,[3] and the Eastern District of Pennsylvania[4] require their respective wheels to be re-filled every two years, and the Central District of California requires its wheels to be refilled every year.[5]

The decision to refill the wheel so infrequently results in additional disparities as younger people are disproportionately Black or African-American and Hispanic or Latino. Thus "[b]y the end of life of the Master Jury Wheel, persons who are 18, 19, and 20 years old are excluded from jury service." Ex. A, 48. The age groups of 18, 19, and 20 year olds are disproportionately Black or African-American and Hispanic or Latino compared to the rest of the population in the district. *Id*., 48-51. As to the source lists for potential jurors, courts have the option, pursuant to the JSSA, of supplementing source lists where the voter registration lists do not produce a representative jury lists. Here exclusive reliance on voter registration lists produces underrepresentation of Black or African-American and Hispanic or Latino people. Ex. A., 79. Notwithstanding this effect, and observations of underrepresentation in SDNY due to exclusive reliance on voter lists nearly twenty-five years ago, *see United States v. Reyes*, 934 F.Supp. 553 (S.D.N.Y 1996), the current Jury Plan maintains voter lists as its single source for potential jurors. The Southern District of New York

---

[2]Plan for Random Selection of Jurors (Jan. 8, 2020), https://www.ilnd.uscourts.gov/_assets/_documents/_forms/_press/ILNDJuryPlan.pdf

[3]Plan for the Random Selection of Grand and Petit Jurors of the United States District Court for the Southern District of Florida (May 5, 2010), https://www.flsd.uscourts.gov/sites/flsd/files/JuryPlan.pdf

[4]Plan for the Random Selection of Grand and Petit Jurors (July 18, 2017), https://www.paed.uscourts.gov/documents/jury/Jury%20Plan.pdf

[5]The Plan of the United States District Court, Central District of California, for the Random Selection of Grand and Petit Jurors (July 15, 2019), https://www.cacd.uscourts.gov/sites/default/files/general-orders/GO%2019-07.pdf

is alone in the circuit in this regard. The Eastern District of New York, in contrast, supplements registered voter lists with lists from the Department of Motor Vehicles.[6]

The problem goes further. Even some registered voters are arbitrarily excluded from consideration for jury service. As Mr. Martin describes, "inactive voters," who, by definition, are still registered to vote because their registration has not been cancelled, *see Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 291 (S.D.N.Y. 2020), are excluded from the Master Wheel in five of the six counties within the White Plains Division. While definite conclusions cannot be drawn regarding their race and ethnicity because that information is not recorded in the data provided, there is reason to believe that the inactive voters are disproportionately Black or African-American and Hispanic or Latino. As detailed in an unrelated civil suit challenging New York State's treatment of inactive voters, a voter expert found that inactive voters, in the 2016 presidential election were disproportionately Black and Hispanic: *Racial identification of 2016 presidential election voters by registration status in NYS database* Table 4, page 12. See, e.g., Declaration of Marc N. Meredith, ECF No. 135-1, *Common Cause/New York v. Brehm*, 17 CV 6770 (AJN).

The racial makeup of the inactive voters in Dutchess County provides further support for this conclusion. In that county, Black or African-American people are 8.85% of the active voters and 10.38% of the inactive voters; Hispanic or Latino people are 7.97% active and 8.23% inactive. Ex. A, 29.

Finally, due to a miscalculation in the proration of counties for the White Plains Division, "285,347 registered voters who should have been considered for the White Plains Division Master Jury Wheel were excluded." Ex. A, 38. This mathematical error systematically excludes Black or

---

[6]https://img.nyed.uscourts.gov/files/local_rules/juryplan.pdf

African-American and Hispanic or Latino persons. Id., 83.

### b. Equal Protection Challenge

The Equal Protection Clause of the Fifth Amendment also prohibits underrepresentation of minorities in both grand and petit juries. To prove a prima facie case of discrimination in grand jury selection in violation of the Equal Protection Clause: (1) the group alleged to be discriminated against must be a recognizable, distinct class; (2) the degree of underrepresentation must be proved over a significant time period; and (3) the selection procedure must be susceptible to abuse or racially non-neutral. *Castaneda v. Partida*, 430 U.S. at 482. The Equal Protection claim requires animus, while the Sixth Amendment claim does not. *See United States v. Gelb*, 881 F.2d 1155, 1161 (2d Cir. 1989) ("While the equal protection clause of the Fourteenth Amendment prohibits underrepresentation of minorities in juries by reason of intentional discrimination, [t]he Sixth Amendment is stricter because it forbids any substantial underrepresentation of minorities, regardless of … motive.") An equal protection claim can only prevail if "it is the product of intentional discrimination." *Alston*, 791 F.2d at 257; *see also Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d ir.1995) ("To prove an equal protection violation, claimants must prove purposeful discrimination.").

Absent intentional discrimination, a jury selection plan does not violate the Equal Protection Clause. *United States v. Rioux*, 97 F.3d 648, 659 (2d Cir.1996). As with our Sixth Amendment challenge, it is indisputable that Black or African- American and Hispanic or Latino people are recognizable and distinct classes, thus the first prong of this test is satisfied.

As to the second prong, for the reasons stated above, Black or African-American and Hispanic or Latino residents are underrepresented in the White Plains grand jury pool. In an Equal Protection challenge, defendants may submit alternative statistical analyses as evidence of improper

14

underrepresentation. *United States v. Johnson*, 21 F. Supp. 2d 329, 334-35 (S.D.N.Y. 1998) One such method is comparative disparity, where a court looks to the differences between "a jury venire and community population" and use "standard deviation calculations to determine if the disparities could be the result of chance." Id at 338. If a defendant shows that a disparity cannot be the result of chance, he has made a prima facie case for an equal protection violation. The burden then shifts to the government to supply a "plausible justification for the method of selecting jurors." *Id*. See also *Castaneda v. Partida*, 430 U.S. at 496, n. 17; *Alston v. Manson*, 791 F.2d 255, 258 (2d Cir.1986).

The Comparative analysis and the Standard Deviation analysis, discussed in the argument regarding the second *Duren* prong, make clear that the level of underrepresentation presented here, regardless of what community the qualified wheel is compared to, "could not have been the result of random factors, chance, or luck, but is the result of a systematic process." Ex. A,  74, 75. That analysis alone is sufficient to shift the burden to the government to provide a "plausible justification" for the methods used to populate the wheel.

### c. JSSA Challenge

Litigants in federal court have a statutory right under the JSSA to "grand and petit juries selected at random from a fair cross-section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861 (1994). Title 28 U.S.C. §1867 (a) and (d) provide that in criminal cases a defendant may move to dismiss an indictment and to stay any further proceedings against him, if there has been a "substantial failure to comply" with the provisions of the JSSA in selecting the grand jury which indicted him or the petit jury to try his case, until such time as the failures have been corrected.

The JSSA sets out procedures for each federal district to randomly select jurors from a "fair

15

cross section of the community in the district or division wherein the court convenes," 28 U.S.C. § 1861, and that no person is to be excluded from service as a juror for any invidious reason. *See id*. §§ 1862; 1863(a). The JSSA's "aim is to assure all litigants that potential jurors will be selected at random from a representative cross section of the community and that all qualified citizens will have the opportunity to be considered for jury service." H.R. Rep. No. 90-1076 (1968) ("House Report"), reprinted in 1968 U.S.C.C.A.N. 1792, 1792. The JSSA forbids the exclusion of jurors based on their race or national origin. 28 U.S.C. § 1862 (1994).

The JSSA also mandates that the procedures for selecting grand jurors "shall ensure that each county ... within the ... division is substantially proportionally represented in the master wheel for that judicial district, division or combination of divisions." 28 U.S.C. § 1863(b)(3). Finally, the Act authorizes the use of voter registration lists, 28 U.S.C. § 1863(b)(2), as long as they produce representative juries. It also mandates that all citizens have the opportunity to be considered for service on juries. The Act requires:

> that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes. It is further the policy of the United States that all citizens shall have the opportunity to be considered for service on grand and petit juries in the district courts of the United States.

28 U.S.C. § 1861.

In order to prevail on a JSSA challenge, a defendant must show a "substantial failure to comply" with the JSSA. 28 U.S.C. § 1867(a). "Mere technical violations of the procedures prescribed by the Act do not constitute substantial failure to comply with its provisions." *United States v. LaChance*, 788 F.2d 856, 870 (2d Cir. 1986). To establish a violation based on group underrepresentation, a defendant must show that the representation of a distinctive group in the

16

community is not fair and reasonable in relation to the number of such persons in the community, and that that underrepresentation is the result of systematic exclusion. *See, e.g., United States v. Rioux*, 97 F.3d 648, 654, 660 (2d Cir.1996). In short, "[t]he *Duren* test 'governs fair cross section challenges under both the [JSSA] and the sixth amendment.'" Id. (internal citations omitted). Thus for the reasons described above, the systematic exclusion of Black or African-American and Hispanic or Latino people from grand jury service violated Allen's rights under the JSSA.

Beyond underrepresentation of Black and Latino persons, the exclusion of southern counties from consideration for jury service for the Allen indictment violates the JSSA's requirement that counties be proportionally represented in the master jury wheel:

> These procedures shall be designed to ensure the random selection of a fair cross section of the persons residing in the community in the district or division wherein the court convenes. They shall ensure that names of persons residing in each of the counties, parishes, or similar political subdivisions within the judicial district or division are placed in a master jury wheel; and shall ensure that each county, parish, or similar political subdivision within the district or division is substantially proportionally represented in the master jury wheel for that judicial district, division, or combination of divisions....

28 U.S.C. § 1863(b)(3).

A district court must ensure that all "counties, parishes, or similar political subdivisions" each contribute names to the "district or division" to ensure a fair cross section of the community. Id. That standard is not met with these facts. SDNY disallowed two counties- New York and Bronx-from contributing any names to the pool of potential grand jurors. This by definition does not ensure that "names of persons residing in each of the counties" are utilized and that the counties are proportionally represented. *Id. See, e.g., United States v. Jackman*, 46 F.3d 1240, 1250 (2d Cir. 1995) (Walker, J., dissent) ("In my view, the patent, non-random exclusion of Hartford and New Britain

residents by the jury clerk's use of a defective wheel would have sufficed to prove a violation of §

1863(b)(3), independent of the effect on the representation of racial minorities.").

Even assuming that it is permissible for a White Plains grand jury to be drawn solely from

the northern counties, Allen's rights were violated under the JSSA.  This was done in one way

through the exclusion of inactive voters. Such exclusion violates the JSSA in a more basic manner

- these individuals are registered voters and therefore should be eligible for inclusion in the Master

Wheel, and potentially sent a qualification questionnaire to determine whether they have moved out

of district or are otherwise ineligible. While certain of the inactive voters have moved outside of the

Southern District, not all have. Indeed, in *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285,

289 (S.D.N.Y. 2020), another court in this district found that tens of thousands of New York voters

have been marked "inactive" even though they continue to reside at their address of registration.

Judge Nathan attributed this problem to flaws in the databases used: that of the United States Postal

Service and the National Change of Address registry. Id.[7]

The fact that "inactive voters" from Dutchess County are considered for jury service

highlights the arbitrariness of this practice. There is no justification for including those individuals

and not the inactive voters in the other northern five counties. This practice finds no justification in

the jury plan or JSSA. To the contrary, because "inactive voters" are still registered voters, the

practice violates both. And because the Jury Plan relies exclusively on voter registration lists, as

opposed to drawing from other sources such as the DMV, individuals who are considered "inactive

---

[7] Further to this point, some inactive voters from Dutchess County made it to the Qualified Wheel because they returned their qualification questionnaires (presumably at their registered address) and qualified to serve. Ex. A,  27.

voters," but are otherwise eligible to serve, have no chance of receiving a qualification questionnaire despite their potential eligibility.

The erroneous proration of counties, which results in the exclusion of nearly 300,000 registered voters in certain northern counties, also violates the JSSA. Although the Jury Plan (Section III.A) dictates that the "number of names to be drawn from each county shall reasonably reflect the relative number of registered voters in each county within respective Master Jury Wheels," the counties are only fully prorated by registered voters in the Manhattan Division, not the White Plains Division. Therefore, although one out of every three persons is selected for the Manhattan Division, the same is not true for registered voters in certain counties in White Plains. Instead, "1 out of every 4.5 registered voters from Putnam, Rockland, and Westchester counties" are selected for inclusion in the White Plains Master Wheel. Id., 37. This implementation violates both the Jury Plan and the JSSA's requirements that counties be proportionally represented in the wheel. Finally, even though they are on the registered voter lists for the respective counties, individuals who included an alternate mailing address when registering to vote in Dutchess, Orange, Putnam and Sullivan counties are arbitrarily excluded from potentially serving on the Master Jury Wheel due to a technical glitch. Ex. A, 42. All told, 76,574 people are excluded this way. Id., 44. Notably, this technical glitch masks the severity of the underrepresentation caused by other factors. In other words, unless the other causes of underrepresentation are remedied (e.g., refilling the wheel more frequently, fixing the proration error, including inactive voters, and including other source lists), fixing this technical glitch will only reveal more underrepresentation of the distinctive groups identified in this motion. Id., 84.

19

**III.  Conclusion**

For the above reasons, Allen's rights, under the Fifth and Sixth Amendments and under the JSSA, to a grand jury drawn from a fair cross-section of the community were violated. The indictment should be dismissed.

Dated:  November 13, 2020

Respectfully submitted,

*/s/ Theodore S. Green*
Theodore S. Green
*Attorney for Tyler Allen*
Green & Willstatter
200 Mamaroneck Avenue - Suite 605
White Plains, New York 10601
(914) 948-5656
theosgreen@msn.com

To: All counsel (by ECF)