USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _2/8/2021___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

TYLER ALLEN & JEFFREY JOHNSON,
                  Defendants.

20-cr-366 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

      Defendants Tyler Allen and Jeffrey Johnson ("Defendants") are charged by Indictment

with one count of Conspiracy to Commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951.

(ECF No. 1.) Before the Court is Defendants' motion to dismiss the Indictment. (ECF No. 24.)

For the following reasons, Defendants' motion is DENIED.

## BACKGROUND

### I.      Procedural Background

      On July 21, 2020, Defendants were charged by Indictment with one count of Conspiracy

to Commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951. (ECF No. 1.) On July 27,

2020, Defendant Allen filed a motion for records pertaining to grand jury selection and

composition. (ECF No. 4.) On September 15, 2020, Defendant Johnson moved to join Defendant

Allen's motion. (ECF No. 15.) At Defendants' initial appearance before this Court on September

22, 2020, the Government agreed—subject to protective order—to provide Defendants with

access to certain documents and materials related to jury selection.

      On November 13, 2020, Defendant Allen filed a motion to dismiss the Indictment,

alleging that his grand jury violated the Sixth Amendment right to a grand jury drawn from a fair

cross section of the community, the Jury Selection and Service Act of 1968 ("JSSA"), and the

Equal Protection Clause of the Fifth Amendment. (ECF No. 24-26.) Counsel for Defendant

Johnson indicated orally at a status conference held on January 6, 2021, that Defendant Johnson wished to join Defendant Allen's motion.

## II.  Southern District of New York Jury Plan

The JSSA requires each federal district court to "devise and place in operation a written plan for random selection of grand and petit jurors." 28 U.S.C. § 1863(a). The Southern District of New York's plan ("Jury Plan") involves the construction of two "master jury wheels"—one for the Manhattan courthouse and one for the White Plains courthouse, every four years. *Amended Plan for the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York*, https://nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf. These master wheels are filled by randomly drawing names from the voter registration lists from the counties located within the Southern District of New York. (*Id.*) Under the Jury Plan, the number of names drawn from each county should be proportionate to the number of registered voters in that county. (*Id.*) The Manhattan Division master wheel contains names drawn from New York, Bronx, Westchester, Putnam, and Rockland counties; the White Plains Division master wheel contains names drawn from Westchester, Putnam, Rockland, Orange, Sullivan, and Dutchess counties. (*Id.*) For the three overlapping counties—Westchester, Putnam, and Rockland—the Jury Plan specifies that names are to be apportioned among the two master wheels to "reasonably reflect the relative number of registered voters of each county." (*Id.*)

Periodically, names are drawn from the master wheels "in an amount sufficient to meet the anticipated demands for jurors for the next six months." (*Id.*) Questionnaires are sent to the individuals whose names are drawn. (*Id.*) The names of individuals who complete the questionnaires and are found qualified to serve as jurors comprise the "qualified jury wheels." (*Id.*) Like the master wheels, there is a Manhattan Division qualified jury wheel and a White

Plains Division qualified jury wheel. (*Id.*) As jurors are needed in each courthouse, names are drawn from the qualified wheels and summonses are sent to those individuals. (*Id.*)

### III.    Expert Analysis

A motion similar to Defendants' is pending in another case in this district, *United States v. Balde*, 20-cr-281 (KPF). Defendants and the Government provided expert analyses from that case to support their positions in this case.

Defendants' expert indicates that, by design, the master wheel excludes (1) "persons who are 18 years old, 19 years old, or 20 years old" because the master wheel is only updated every four years[1] and (2) individuals who are not registered to vote. The qualified wheel, by design, also excludes individuals who move addresses within the Division during the period between the construction of the master wheels because these individuals are unlikely to receive questionnaires and summonses. Defendants' expert additionally found that there are "three large groups of registered voters who are excluded from possible jury service in the White Plains Division." These are (1) "inactive voters in Orange, Putnam, Rockland, Sullivan, and Westchester counties"; (2) "voters eliminated by the incorrect proration of Putnam, Rockland, and Westchester counties";[2] and (3) "voters in Dutchess, Orange, Putnam, and Sullivan counties

---

[1] The Southern District of New York's Jury Plan requires construction of a new master wheel every four years and "no later than September 1 following the date of each Presidential Election." *Amended Plan For the Random Selection of Grand and Petit Jurors in the United States District Court for the Southern District of New York*, https://nysd.uscourts.gov/sites/default/files/pdf/juryplan_feb_2009.pdf,4. Therefore, Defendants' master wheel was presumably constructed, at the latest, on September 1, 2017, drawing from registered voters. The Government's expert confirms that the master wheel was constructed from November 1, 2016 county voter registration lists. (ECF No. 31-1 ¶ 6.) Defendants were charged by Indictment on July 21, 2020. As such, all eighteen-, nineteen-, and twenty-year-old individuals were excluded from their grand jury. Defendants' expert confirms that the youngest possible grand juror on Defendants' grand jury "would be 21 years, 5 months, and 7 days old." (ECF No. 25-1 ¶ 51.)

[2] The implementation of the Jury Plan involves selecting 1 out of every 3 registered voters from each county for the master wheel. However, because voters in Putnam, Rockland, and Westchester counties are represented in both the Manhattan Division and White Plains Division master wheel, the selection process for these counties is slightly different. One out of three registered voters from these counties is selected for the Manhattan Division master wheel; then, one out of three registered voters *from the remaining pool* is selected for the White Plains Division master wheel. The result of this is that one out of 4.5 registered voters in these overlapping counties is selected for the White Plains master wheel. (ECF No. 25-1 ¶ 37.)

with alternate mail addresses in the voter registration lists."[3] (ECF No. 25-1 at 22.) Defendants' expert opines that all of these exclusions result in underrepresentation of "Black or African-American" persons and "Hispanic or Latino" persons in the relevant jury wheels.

The "jury-eligible population" of a given district or division is usually defined as the population of U.S. citizens that is eighteen years or older.[4] (ECF No. 25-1 ¶ 16; ECF No. 31-1 ¶ 2.) The jury-eligible population for the White Plains Division is 76.06% White, 12.45% Black or African-American, 0.29% American Indian or Alaska Native, 3.96% Asian, 0.04% Native Hawaiian or Pacific Islander, 5.15% of some other race, and 2.06% multi-racial. (ECF No. 25-1, 21.) The jury-eligible population for the White Plains Division is 14.12% Hispanic or Latino. (*Id.*)

The demographics of the master wheel from which Defendants' grand jury was drawn are approximately 11.20% Black or African-American and approximately 12.97% Hispanic or Latino.[5] (ECF No. 31-1 ¶ 28.)

The demographics of the qualified wheel from which Defendants' grand jury was drawn are 78.70% White, 8.76% Black or African-American, 0.15% American Indian or Alaska Native, 5.22% Asian, 0.15% Native Hawaiian or Pacific Islander, 5.00% of some other race, and 2.02% multi-racial. The qualified wheel is 10.48% Hispanic or Latino. (ECF N. 25-1 ¶ 55.)

---

[3] The zip codes of "alternate addresses" for registered voters in Dutchess, Orange, Sullivan, and Putnam counties were not transcribed to the master wheel. As a result, Defendants allege these individuals were less likely to receive jury questionnaires and summonses. (ECF No. 25-1 ¶ 42-43.)

[4] Although not all U.S. citizens age eighteen years or older are eligible for jury service, this is a standard definition for the analysis of jury lists. (ECF No. 25-1 ¶ 16.)

[5] While the demographics of the community are reflected in census data and the demographics of the qualified wheel are ascertained through the questionnaire process, the demographics of the master wheel are unknown. To approximate the demographics of the qualified wheel, the Government's expert utilized geocoding, which estimates the racial and ethnic composition based on residential address. (ECF No. 31-1 ¶ 26.) One limitation of geocoding is that it relies on census data to estimate the racial and ethnic composition, whereas the jury wheels are constructed from voter registration data. If certain racial or ethnic groups are less likely to register to vote, geocoding may overestimate their presence on the master wheel. However, the Government's expert indicates that there "is no valid statistical evidence to conclude there is such a difference." (*Id.*)

Defendant Allen is a black male who was twenty-one years old at the time the Indictment was returned. (ECF No. 26 at 2.)

## LEGAL STANDARD

The Sixth Amendment provides criminal defendants with the right to a jury drawn from a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975). This right extends to both petit and grand juries. *See United States v. Osorio*, 801 F. Supp. 966, 974 (D. Conn. 1992). "In order to establish a *prima facie* violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and; (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364 (1979).

Similarly, the JSSA provides that "all litigants in Federal court entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The same three-pronged fair cross-section test established for Sixth Amendment challenges in *Duren* governs fair cross-section challenges under the JSSA. *United States v. Rioux*, 97 F.3d 648, 654 (2d Cir. 1996).

A defendant may also prevail on a JSSA challenge if he or she can show other "substantial failure[s] to comply" with the JSSA. *United States v. LaChance*, 788 F.2d 856, 870 (2d Cir. 1986). "Mere 'technical' violations of the procedures prescribed by the Act do not constitute 'substantial failure to comply' with its provisions." *Id*. "Whether a violation is

'substantial' or merely 'technical' depends upon the nature and extent of its effect on the wheels and venire from which a defendant's grand jury was derived." *Id.* at 870.

The Equal Protection Clause of the Fifth Amendment also prohibits exclusion of racial or ethnic groups from grand and petit juries. *Castaneda v. Partida*, 430 U.S. 482, 492 (1977). In order to "show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Id*. at 494. To make this showing, a defendant must: (1) establish "that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied"; (2) prove the degree of underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time"; and (3) the selection procedure must be susceptible to abuse or racially non-neutral. (*Id*.)

## DISCUSSION

### I.    Sixth Amendment

Defendants aver that the composition of their White Plains grand jury violates the Sixth Amendment because "Black or African-American" persons and "Hispanic or Latino" persons are underrepresented due to various facets of the Southern District's Jury Plan and failures to comply with the Jury Plan. To establish a *prima facie* violation, Defendants must show: "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren*, 439 U.S. at 364.

A.    *Distinctive Group*

The parties correctly recognize that both "Black or African-American" persons and "Hispanic or Latino" persons are "distinctive" groups in the community. *United States v. Jackman*, 46 F. 3d 1240, 1246 (2d Cir. 1995); *United States v. Biaggi*, 680 F. Supp. 641, 648 (S.D.N.Y.), *aff'd*, 909 F. 2d 662 (2d Cir. 1990).

B.    *Significant Underrepresentation*

1.    <u>Relevant Populations</u>

To prevail, Defendants must demonstrate that "Black or African-American" persons and/or "Hispanic or Latino" persons are significantly underrepresented in the jury pool when compared to their representation in the community. *Duren*, 439 U.S. at 364. In order for the Court to properly determine whether there is a significant underrepresentation of "Black or African-American" persons or "Hispanic or Latino" persons, it must first determine which community and which pool of jurors to compare. Defendants compare the White Plains Division's qualified wheel to the jury-eligible population of the Manhattan Division, the entire Southern District of New York, and the White Plains Division. (ECF No. 26 at 9-10.) The Government compares the White Plains Division's master wheel only to the population of jury-eligible population of the White Plains Division. (ECF No. 31 at 9.)

**Community Population**

The Court finds that the proper community for comparison is the jury-eligible population within the White Plains Division. As Defendants acknowledge, although *Duren* did not define the relevant community for a fair cross-section analysis, it is widely understood to mean "the district or division where the trial is to be held." *United States v. Johnson*, 21 F. Supp. 2d 329, 334-35 (S.D.N.Y. 1998). In this case, Defendants' trial will be held in the White Plains

courthouse. Therefore, the jury-eligible population of the White Plains Division is the appropriate community.

## Jury Wheel

In their analysis, Defendants compare the demographics of the community to the demographics of the White Plains *qualified* jury wheel. (ECF No. 26 at 9.) The Government, on the other hand, compares the community to the White Plains *master* jury wheel. (ECF No. 31 at 9-11.) The Second Circuit has not stated a preference for the use of one wheel over the other and has held that the relevant jury pool "may be defined by (1) the master list; (2) the qualified wheel; (3) the venires; or (4) a combination of the three." *Rioux*, 97. 3d at 657.

In this case, the Court finds that the proper jury wheel is *both* the White Plains master wheel and the Whites Plains qualified wheel. This is because Defendants aver that systematic selection issues impact both the master wheel and the qualified wheel. Defendants aver that the master wheel is directly impacted by (1) the use of voter registration lists as the sole source of potential jurors, (2) the replenishing of the master wheel only once every four years, and (3) various failures to comply with the plan including the exclusion of inactive voters and improper proration of jurors between the Divisions. (ECF No. 25-1 ¶ 22, 48-51, 79.) Defendants further assert that the practice of replenishing the master wheel every four years has the effect of excluding individuals who move frequently, a group that is disproportionately "Black or African-American" and "Hispanic or Latino." (ECF No. 25-1 ¶ 13.) This practice would only impact the qualified wheel because these individuals could be selected for the master wheel, but would be unable to join the qualified wheel, as their questionnaires would be sent to an incorrect address. (ECF No. 25-1 ¶ 13, 52.) Similarly, Defendants assert that a clerical error in the handling of

individuals with alternate addresses resulted in the underrepresentation of those individuals in the qualified wheel. (ECF No. 25-1 ¶ 41-45.)

Nonetheless, the Court notes that the vast majority of Defendants' claims address underrepresentation in the master wheel. Further, the Court notes that there are non-random factors that influence the composition of the qualified wheel and the qualified wheel's composition can be influenced by external forces. *See Rioux*, 97 F.3d at 658.

2.     Method of Determining Underrepresentation

**Overview**

Courts in the Second Circuit have considered three methodologies for quantifying the degree of underrepresentation of groups in jury wheels. First, Courts have employed Statistical Decision Theory ("SDT"), which measures the likelihood that the underrepresentation would have occurred by sheer chance if the jury wheels were randomly selected from the population. *Rioux*, 97 F.3d at 655. Second, Courts have employed the Absolute Disparity Method, which is simply the difference in percentage of the relevant group in the community and the jury wheel. *Id*. at 655-56. Some courts have supplemented this with an "absolute numbers" approach whereby they convert the absolute disparity to an absolute number of jurors of the underrepresented demographics that would need to be added to a typical venire to eliminate underrepresentation. *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990). This method helps the courts realize that actual impact of the underrepresentation. Finally, Courts have considered the Comparative Disparity Method, which "measures the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Rioux*, 97 F. 3d at 655 (quoting *Ramseur v. Beyer*, 983 F.2d 1215, 1231-32 (2d Cir. 1992). This value is calculated by dividing the absolute disparity by the percentage of

the relevant group in the community and converting to a percentage by multiplying by 100. *Rioux*, 97 F.3d at 655.

In order to determine the appropriate method for this particular scenario, the Court turns to the Second Circuit's prior decisions. In *Jenkins*, the Second Circuit found no unfair underrepresentation in the master wheel where the "percentage of [Blacks/African-Americans] among the adult population (i.e. aged 21 years or older) in the New Haven division was 5.45%" and "only 3.3% [of the individuals in the master wheel] [w]ere" Black or African-American. *United States v. Jenkins*, 496 F.2d 57, 64 (2d Cir. 1974). In *Jenkins*, the Court considered whether it should use the absolute disparity/numbers approach or the comparative disparity approach. The absolute disparity was 2.15%, whereas a comparative analysis identified that the ratio of representation in the general population to the jury population was 5 to 3.[6] The court embraced the absolute disparity/numbers approach and affirmed the district court's finding that the disparity would "add to an average array of 50 to 60 veniremen only one (1) additional" Black or African-American person, which is not "substantial enough to deprive appellants of their constitutional or statutory rights." *Id*. at 65.

In *Biaggi*, the Second Circuit found no unfair underrepresentation in the master wheel where there was an absolute disparity of 3.6% for African-Americans and an absolute disparity of 4.7% for Hispanics. *Biaggi*, 909 F.2d at 677. The district court noted "that addition of two Blacks and two to three Hispanics to a venire of typical size would be required to eliminate underrepresentation." *Id*. at 678. While the Second Circuit affirmed, it noted that "[w]e think the facts of this case press the [absolute numbers] approach to its limit, and would find the Sixth

---

[6] Note that this would yield a comparative disparity of (2.15%/5.45%) x 100, or approximately 40%.

Amendment issue extremely close if the underrepresentations had resulted from any circumstance less benign than use of voter registration lists." *Id.*

Following *Biaggi*, the Second Circuit declined to use the absolute numbers approach when presented with unusual circumstances in *Jackman*. In an earlier case, the district court had determined that the Hartford Division of the District of Connecticut had inadvertently failed to include residents of Hartford and New Britain in the jury selection process, which resulted in the underrepresentation of Black and Hispanic jurors. Following this revelation, the district adopted a new plan and a new qualified wheel was constructed. However, in *Jackman* it was revealed that instead of relying solely on the new qualified wheel as a source of names, the jury clerk for Jackman's jury generated a list using the old pool of names and then supplemented that list with names from the new list. As a result, the "picking list" for Jackman's trial included 78 drawn names from the old pool, which excluded Hartford and New Britain residents, and 22 names drawn from the new pool, which included Hartford and New Britain resides.

In *Osorio*, the court had determined that "[t]he 1990 census indicated that 6.34% of the voting-age population in the [Hartford] Division is Black and 5.07% is Hispanic." *Jackman*, 46 F.3d at 1242. However, the *Jackman* court estimated that in the "functional wheel" used for identifying jurors at the time of Jackman's trial, "Blacks would be 3.8% and Hispanics would be 1.72%." *Id.* at 1246. The *Jackman* court noted that under the absolute numbers approach, "the underrepresentation in the 'functional wheel' might not be regarded as substantial," and decided against applying the absolute numbers approach. *Id.* at 1246. The *Jackman* court rejected the absolute numbers approach because of its "questionable validity when applied to an underrepresented group that is a small percentage of the total population" and because "[t]he facts in [the] case reveal[ed] circumstances far less benign than those in *Biaggi*." *Id.* at 1247. Instead,

the *Jackman* court applied SDT and determined that the "functional wheel" would have created a 27.2% chance of no Hispanics in any given venire, whereas a perfectly representative wheel would have created a 2% chance of no Hispanics in any given venire. *Id*. The court found this disparity substantially worse than the disparity in *Biaggi* and concluded that there was substantial underrepresentation. *Id*.

In *Rioux*, the Second Circuit returned to the absolute disparity approach. Although the court conceded that the minority populations were a relatively small percentage of the total population (Blacks were 8.33% and Hispanics were 5.18%), the court found that "a small minority population alone is not enough to preclude the absolute numbers method." *Rioux*, 97 F.3d at 656. The *Rioux* court also indicated that the jury process it was analyzing derived jurors from "voter registration records and drive registration records, and no significant data are missing." *Id*. at 656. The court calculated the absolute disparity for Black jurors in the qualified wheel to be 1.58% for petit juries and 2.08% for grand juries and the absolute disparity for Hispanic jurors in the qualified wheel to be 2.14% for petit and grand juries. The *Rioux* court calculated that "approximately two Blacks would have to be added to a pool of 125" petit jurors "an additional two or three Blacks would have to be added to a pool of 125" grand jurors, and "an additional two or three Hispanics" would have to be added to a pool of 125 petit or grand jurors to "eradicate the underrepresentation." *Id*. at 657-58. The *Rioux* court found that "such meager numbers do not present an infirmity of constitutional magnitude" and was "unable to conclude that there is any unfair underrepresentation of Blacks and Hispanics." *Id*. at 658.

**Appropriate Method**

The Second Circuit disfavors the comparative disparity method, which it has consistently rejected. See *Rioux*, 97 F. 3d at 655; *Jenkins*, 496 F.2d at 65–66. Further, although the Second

Circuit has considered SDT several times, it is also disfavored. In *Rioux*, the Second Circuit explained that "[i]t is illogical to apply a theory based on random selection when assessing the constitutionality of a qualified wheel." *Rioux*, 97 F. 3d at 655. This Court agrees. The qualified wheel is inherently not random because individuals must meet specific non-random criteria to qualify for the wheel. Further, while the master wheel should be closer to random, from a practical standpoint, the names on the master wheel need to draw from some variety of sources, none of which will be truly random. *See United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990) (finding disparities that push the limit of the absolute numbers approach acceptable because they resulted from the benign use of voter registration lists). Courts have also emphasized that the Sixth Amendment provides the right to a jury representing a *fair* cross-section of the community, which is not synonymous with a perfectly proportioned jury. *See Jenkins*, 496 F.2d at 65 (remarking that the legislative history of the JSSA, which tracks the Constitutional language and analysis, "makes clear, however, that in using the term 'fair cross section of the community' Congress intended to permit 'minor deviations from a fully accurate cross section'").

Further, this case is distinguishable from *Jackman*, where the data was limited, the minority population was very small, and there was a clear, identifiable issue that contributed to the underrepresentation and had previously been found unconstitutional.[7]

---

[7] The Court also notes *Jackman* does not provide clear guidance on how to apply SDT in this context. Defendants' expert compares the qualified wheel to the community and indicates that, assuming the qualified wheel was randomly drawn from the White Plains Division's jury-eligible population, the demographic divergence observed would be expected less than approximately 0.5% of the time. This indicates that it is highly unlikely that the qualified wheel was randomly constructed from the White Plains Division jury-eligible population. *Jackman*, a case during which the defendant objected to the presence of only one Hispanic on his venire, employed SDT to look at other measures. For example, it looked at the probability that a given venire would have no Hispanics if it were drawn from the actual population of jury-eligible voters (2%) versus the "functional wheel" (27.2%) and compared that to *Biaggi*, where the actual population would have yielded a .0003% chance a given venire would have no Hispanics and the actual wheel would have yielded a .016% chance a given venire would have Hispanics. *Jackman*, 46 F.3d at 1247. The Court also considered that "the wheel used in *Biaggi* created only a 2.88% chance that any given venire would

The absolute disparity method, on the other hand, appears to be the preferred method for analyzing jury underrepresentation under the Sixth Amendment in the Second Circuit. *See Rioux*, 97 F. 3d at 655; *Jenkins*, 496 F.2d at 66; *Biaggi*, 909 F. 2d at 678. The Court notes that there are limitations to this method, especially for minority groups that constitute a small percentage of the population.[8] However, in this case, although the minority groups are small—consisting of 12.45% and 14.12% of the population—they are significantly larger than in *Jenkins*, *Rioux*, and *Jackman*.

When applied here, there is an absolute disparity for "Black or African-American" persons of 1.25% (12.45%-11.20%) for the master wheel and 3.69% (12.45%-8.76%) for the qualified wheel and an absolute disparity for "Hispanic or Latino" persons of 1.15% (14.12%-12.97%) for the master wheel and (14.12%-10.48%) 3.64% for the qualified wheel. (ECF No. 25-1 ¶ 63-64; ECF No. 31-1 ¶ 4, 28.) This means that, assuming a venire of sixty and examining the disparity under the master wheel, there would need to be fewer than one additional "Black or African-American" person and fewer than one additional "Hispanic or Latino" persons.[9] When examining the disparity under the qualified wheel, there would need to be approximately slightly more than two "Black or African-American" persons and slightly more than two "Hispanic or Latino" persons.

**Significance of Underrepresentation**

---

have less than one-fourth of the number of Hispanics that would appear in a representative venire, while the functional wheel, appropriate for analysis in this case, created a 62.94% chance of such a substantially underrepresentative venire." *Id.*

   [8] For instance, an absolute disparity of 3% could mean 0% representation on a jury wheel for a minority group that comprises 3% of the community, but could also mean 27% representation on a jury wheel for a minority group that comprises 30% of the community.

   [9] To remain consistent with other opinions in this Circuit, the court calls these "additional" persons. However, in reality, these persons would not be added to the venire to achieve proper representation; rather, they would need to replace a person on the venire whose demographic is overrepresented.

The Court finds that the underrepresentation of "Black or African-American" persons and "Hispanic or Latino" persons is not significant enough to arise to a Sixth Amendment violation in this case. In *Jenkins* and *Biaggi*, the Second Circuit found absolute disparities between the community population and the master wheel of 2.15%, 3.6%, and 4.7% to be insignificant. Here, the disparities between the community and the master wheel are 1.25% and 1.15%. These disparities clearly fall below the Second Circuit's established threshold for showing significant underrepresentation in a master wheel.

*Rioux* is the only of the three cases that compares the community to the qualified wheel. In that case, the court determined that absolute disparities of 1.58% and 2.14% were acceptable. Although the absolute disparities here are larger—3.69% and 3.64%—the Court finds they do not rise to the threshold of "significant" under the Sixth Amendment. This is because the causes of disparities in the master wheel impact both the master wheel and the qualified wheel. (The qualified wheel is, in fact, a subset of the master wheel.) Therefore, the acceptable disparities of 3.6% and 4.7% between the community and master wheel in *Biaggi* would also have been acceptable between the community and qualified wheel in *Biaggi*. Further, although there are admittedly some implementation issues with the Jury Plan, the allegations that Defendants make are mostly minor and/or benign like those in *Biaggi*.

### C.  *Underrepresentation Due to Systematic Exclusion*

Even if Defendants were able to demonstrate significant underrepresentation, their argument would fail as to the qualified wheel due to an inability to attribute the underrepresentation to systematic exclusion. A defendant cannot "make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Berghuis*, 559 U.S. at 332 (emphasis in original). "There is

systematic exclusion when the underrepresentation is due to the system of jury selection itself, rather than external forces." *Rioux*, 97 F.3d at 658.

Defendants' expert provides some evidence for his assertion that the issues Defendants identify cause underrepresentation of "Black or African-American" and "Hispanic or Latino" persons.[10] However, Defendants' expert does not quantify the impact each of its offered sources of systematic exclusion have on the demographics of the master or qualified wheel. The Government's expert on the other hand, attempts to quantify some of sources and concludes that: (1) issues with improperly prorating counties shared between the White Plains and Manhattan divisions lower the "Black or African-American" persons percentage by 0.34 percentage points and lower the "Latino or Hispanic" persons percentage by 0.39 percentage points on the master/qualified jury wheel; (2) failure to consider inactive voters in some counties lowers the "Black or African-American" persons percentage by 0.34 percentage points on the master/qualified jury wheel and the "Hispanic or Latino" persons percentage by 0.43 percentage points on the master/qualified jury wheel; (3) the failure to randomly draw persons from juror lists lowers the "Black or African-American" persons percentage by 0.57 percentage points on the master/qualified jury wheel and the "Hispanic or Latino" persons percentage by 0.33 percentage points on the master jury wheel; (4) clerical errors in transferring alternative mailing addresses to the master jury wheel *increase* the "Black or African-American" persons percentage by 0.14 percentage points on the qualified jury wheel and the "Hispanic or Latino" persons percentage by 0.10 percentage points on the qualified jury wheel; and (5) difference in being found to be qualified as a juror or being excused lower the "Black or African-American" persons

---

[10] *See* ECF No. 25-1 ¶ 29 (disparity caused by exclusion of inactive voters); ¶ 40 (disparity caused by improper proration); ¶ 49-50 (disparity caused by elimination of young voters); ¶ 52 (disparity caused by elimination of frequent movers)).

percentage by 2.58 percentage points on the qualified jury wheel and the "Hispanic or Latino" persons percentage points by 2.59 percentage points on the qualified jury wheel. (ECF No. 31-1 ¶ 32-38.)

This analysis seems to indicate that the systematic exclusions offered by Defendants do, in fact, cause a significant portion of the underrepresentation on the master wheel. Prorating issues and failure to consider inactive voters "resulted in the actual mastery jury wheel representation of African Americans being 0.68 percentage points lower and Hispanics being 0.82 lower and, as a result the absolute disparity between the actual master jury wheel and the community was 1.25[%] for African American and 1.15[%] for Hispanics." *Id.* ¶ 33. Put another way, these two rationales explain 54% of the disparity for "Black or African-American" persons and 71% of the disparity for "Hispanic or Latino" persons in the master wheel. Further, these issues are not due to external factors, but rather are issues with the way the master wheel is implemented. In fact, the improper proration of voters across counties is reminiscent of a much more benign version of *Jackman*, where the Court found systematic exclusion where two cities that had large minority populations were significantly underrepresented in the jury list. As such, the Court finds that Defendants prevail on showing that systematic exclusion accounts for a large portion of underrepresentation on the master wheel. However, the underrepresentation on the master wheel is only about one-third of the total underrepresentation on the qualified wheel.

As to the qualified wheel, the Government argues that "69.9% of the reason for the difference between Black or African-American individuals on the White Plains Qualified Jury Wheel and the White Plains voting-age population and 71.2% of the reason for the difference between Hispanic or Latino individuals on the White Plains Qualified Jury Wheel and the White

Plains voting-age population are the qualification, exemption, and excusal of those individuals. The defendant therefore fails to prove that the factors he cites are in fact responsible for the disparity he alleges." (ECF No. 31 at 20.) To the contrary, one of the systematic factors Defendants offer is that "Black or African-American" persons and "Hispanic or Latino" persons are adversely impacted by the Southern District's decision to update the master wheel every four years because they move more frequently than persons from other demographics. Under this theory, "Black or African-American" persons and "Hispanic or Latino" persons are more likely to have undeliverable or unanswered questionnaires. The Government's expert indicates that a substantial majority of the disparity is explained by qualification, exemption, and excusal of individuals, which it indicates includes unreturned questionnaires. The Government's expert fails to indicate precisely what portion of the disparity is due to undeliverable questionnaires and unreturned questionnaires due to changed mailing addresses, as opposed to other rationales. As such, the Government's evidence does not preclude these reasons from being systematic factors which lead to underrepresentation. Nonetheless, Defendants fail to provide evidence that moving disparities did, in fact, cause the underrepresentation.

Further, the Second Circuit has found that factors due to an "external force" do not amount to systematic exclusion. "The inability to serve juror questionnaires because they were returned as undeliverable is not due to the system itself, but to outside forces, such as demographic changes." *Rioux*, 97 F.3d at 658. The *Rioux* decision rejected a similar challenge to the use of two-and-a-half-year-old voter registration rolls. *Id*. Therefore, the Court finds that although it is conceivable that the use of four-year-old voter registration rolls caused a portion of

the disparity on the qualified wheel, Defendants fail to provide sufficient evidence and therefore this type of exclusion does not qualify as "systematic exclusion."[11]

Therefore, Defendants' Sixth Amendment claims are denied.

## II.   JSSA

Defendants bring two claims under the JSSA. First, Defendants claim that their grand jury was not selected from "a fair cross section of the community." (ECF No. 26 at 16.) Because the JSSA analysis for this type of claim mirrors the Sixth Amendment analysis, this claim is properly denied.

Second, Defendants assert a "substantial failure to comply" with other aspects of the JSSA. Defendants argue this failure is based on (1) the exclusion of Southern counties (New York and Bronx) from the White Plains Division's jury wheels, (2) prorating errors between the overlapping counties, (3) the exclusion of inactive voters from some counties, and (4) a clerical issue with alternate mailing addresses.

As an initial matter, the Court finds that the exclusion of New York and Bronx counties from the White Plains Division's jury wheels is not a violation of the JSSA. The practice of drawing jurors from within a division, as opposed to the entire is well-accepted and Defendants offer no authority to the contrary. *See United States v. Bahna*, 68 F.3d 19, 24 (2d Cir. 1995) ("It is well-settled that neither the jury selection statute nor the Constitution requires that jurors be drawn from an entire district.").

Similarly, the Court finds that the exclusion of inactive voters is not a violation of the JSSA. Inactive voters are registered voters whose "status is changed to 'inactive' because the

---

[11] The Court notesthat there must be limitations to this logic. For example, if a district updated its master wheel every twenty years, the exclusions would be much more substantial and it would hard to not find systematic exclusion.

county elections boards have received information, whether accurate or not, that the voter has moved." (ECF No. 33 at 2-3.) It is entirely logical for a jury selection process to exclude individuals who have since moved. Defendants argue that tens of thousands of New Yorkers throughout the state are improperly designated as "inactive" voters. Even if true, that is a small percentage of the state's inactive voters. Defendants argue that there are 97,875 "inactive" voters excluded from consideration for the master wheel in the White Plains Division alone. Further, even if the exclusion of inactive voters is a violation of the JSSA, it is certainly a technical violation. The Government's expert quantified the impact of excluding inactive voters from the jury selection process and found it to be minimal. That, combined with the logical nature for exclusion of inactive voters is sufficient to demonstrate that it is, at most, a mere technical violation.

The clerical issue involving improperly transcribing alternate addresses of individuals to the master wheel is a technical violation of the JSSA. By not properly preserving alternate addresses in the process of constructing master wheels, a subset of the jury-eligible population is inadvertently excluded from the master wheel. However, the Government's expert indicated that this inadvertent exclusion has a minimal impact on the qualified wheel and, in fact, slightly *increases* the representation of "Black or African-American" persons and "Hispanic or Latino" persons. While Defendants' challenge here is not with regards to racial/ethnic composition of the jury wheels, but rather to with regards to a different violation of the JSSA, whether that violation is substantial hinges upon the "extent of its effect on the wheels." *LaChance*, 788 F.2d at 870. As such, the Court finds that the clerical alternate address issue is a technical violation of the JSSA.

Finally, the improper prorating of voters across counties is also a technical violation of the JSSA. Under the jury plan, each registered voter in the non-overlapping counties has a 1-in-3 chance of being selected for the master wheel. However, in the overlapping counties, the process is different. One in three registered voters are selected for the Manhattan Division's jury wheel. Then, one in three of the remaining registered voters are selected for the White Plains Division's master wheel. Therefore, registered voters in the overlapping counties have a 1-in-4.5 chance of being selected for the White Plains Division's master wheel. Again, the Government's expert provided an analysis of the impact of improper prorating and found the effect to minimal. As such, the Court finds this violation is technical.

Therefore, because the only violations demonstrated are technical rather than substantial, the Court denies Defendants' JSSA claims.

### III.    Equal Protection Clause

In order to "show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda*, 430 U.S. at 494. To make this showing, a defendant must: (1) establish "that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied"; (2) prove the degree of underrepresentation "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time"; and (3) the selection procedure must be susceptible to abuse or racially non-neutral. (*Id.*)

Defendants fail to meet the third prong of this test.[12] Although "clear statistical evidence may raise a presumption of intentional discrimination in some cases, this presumption may be rebutted by the government." *Rioux*, 97 F.3d at 659 (citing *Alston*, 791 F. 2d at 257). Defendants have not demonstrated that any of the contested selection procedures produce a disparity that rises to the level of inferring intentional discrimination. *Cf. Alston*, 791 F. 2d at 256-57 (finding that a town-based quota system which caused 368 black individuals to be summoned, instead of 501 on an array of 8,405 was not racially neutral). In *Biaggi*, the court concluded that disparities due to reliance on voter registration lists did not evidence intentional discrimination because there was "nothing 'ineluctable' about the underregistration of blacks and Hispanics in the area served by the Manhattan courthouse." *Biaggi*, 680 F. Supp. 641 at 652. This logic extends to disparities caused by clerical errors used in processes alternate addresses, removal of "inactive" voters, and the decision to update the master wheel every four years. All of these alleged issues are facially race-neutral and their impact on the racial composition of the wheels is neither inevitable, nor substantially demonstrated. The only issue Defendants allege that is comparable to that in *Alston*, is the improper prorating of voters across overlapping counties. However, Defendants fail to attribute a significant disparity to this issue. Further, Defendants have not shown how the Jury Plan might potentially be susceptible to abuse. As such, Defendants' Fifth Amendment claims fail.

---

[12] In fact, Defendants fail to address this prong whatsoever and instead argue that "[i]f a defendant shows that a disparity cannot be the result of chance, he has made a prima facie case for an equal protection violation. The burden then shifts to the government to supply a 'plausible justification for the method of selection jurors.'" (ECF No. 26 at 16.) This is an improper interpretation of the two cases Defendants rely on to support this assertion. *See Castaneda*, 430 U.S. at 497 (finding that the burden shifted to the Government *after* defendant met all three required prongs, including demonstrating that the key-man system used to select jurors "is susceptible of abuse as applied"); *Alston v. Manson*, 791 F.2d 255, 257 (2d Cir. 1986) (finding that the burden shifted to the Government *after* defendant met all three required prongs, including demonstrating that the statutory quota scheme was not racially neutral).

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is DENIED. The Clerk of the

Court is respectfully directed to terminate the pending motion at ECF No. 24.

Dated:   February 8, 2021
       White Plains, New York

SO ORDERED:

_____

NELSON S. ROMÁN
United States District Judge