

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States District Courthouse*
*300 Quarropas Street*
*White Plains, New York 10601*

July 7, 2021

**BY ECF**
The Honorable Nelson S. Román
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

> Re:    *United States v. Tyler Allen*, 20 Cr 366 (NSR)

Dear Judge Román:

The Government respectfully submits this letter in advance of the sentencing of the defendant, Tyler Allen, scheduled for July 14 or July 15, 2021.  As described below, the Government respectfully submits that a sentence within the Sentencing Guidelines range of 70 to 87 months' imprisonment would be sufficient, but not greater than necessary to reflect the seriousness of the defendant's conduct, wherein defendant made extensive plans to commit two robberies, one of which involved the plan to break into a family's home in the middle of the night, tie up and pepper spray the parents, and then beat up and do whatever was necessary to force a teenager to disclose the code to what the defendant believed to be tens of millions of dollars in the cryptocurrency, Bitcoin.  And the defendant and his co-conspirators did not just plan for these actions, they came close to executing their violent plan and may well have done so had they not been thwarted by law enforcement.  In fact, Tyler Allen broke one of the victim's windows and climbed into the victim's basement, carrying a backpack packed with an imitation firearm, brass knuckles, and a taser.  Luckily, Allen's violent plans were thwarted when he triggered the victim's security alarm and became trapped in the victim's basement, but his actions plainly demonstrate his intent to commit serious violence.  A Guidelines sentence is further appropriate to promote respect for the law, to ensure adequate general and specific deterrence, and to prevent sentencing disparities.

**A.    Factual Background**

On or about May 7, 2020, the defendant and his co-conspirator and co-defendant, Jeffrey Johnson, traveled from Rochester, New York to Brockton, Massachusetts for the purpose of breaking into an individual's home ("Victim-1") and forcing Victim-1 to provide the code to his/her cryptocurrency, Bitcoin.  (PSR ¶ 9).  While in Brockton, Johnson and Allen went to what they believed to be Victim-1's residence and conducted reconnaissance, taking videos and photographs of the outside of the home, as they searched for evidence of cameras and planned where to break in and how to flee.  Ultimately, Johnson and Allen did not follow through with the

planned robbery, and while law enforcement was unable to determine the exact reason, one reason may have been that they had the wrong address for Victim-1. (*Id.*).

Undeterred by their unsuccessful efforts in Brockton, almost immediately after returning home, Johnson, Allen, and other co-conspirators began planning a second robbery, targeting another individual who contemporaneous news reports claimed had stolen around $24 million in Bitcoin ("Victim-2"). (PSR ¶¶ 10-11). Other co-conspirators were recruited to act as getaway drivers, monitor police scanners, and/or participate in the robbery itself. In exchange, these other co-conspirators were promised that they could receive compensation if the planned robbery was successful. (PSR ¶ 10). The co-conspirators further obtained equipment for the planned robbery, which included bulletproof vests, a taser, a pellet gun that resembled a 9mm handgun, brass knuckles, knives, two cans of pepper spray, a battering ram, and dark-colored clothing. (PSR ¶¶ 10, 13).

In the days leading up to their departure, Johnson, Allen and other co-conspirators had meetings to discuss the planned robbery. Such meetings involved discussing the need to tie up Victim-2's parents and spray them with pepper spray, while using the imitation gun and real knives to scare Victim-2, beat him/her up, and do whatever else was required until Victim-2 provided the Bitcoin code. (PSR ¶ 11, 13).

On or about May 19, 2020, Johnson, Allen, and the other co-conspirators drove from Rochester, New York to the Jersey City, New Jersey, where they stayed in an Airbnb for several days as they further planned the robbery. Over the next several days, Johnson, Allen, and other co-conspirators went to Victim-2's home in Irvington, New York on several occasions to conduct reconnaissance, looking for security cameras, alarm systems, and doors and windows that they could break into. (PSR ¶ 14-16). During one of the reconnaissance operations, some of the co-conspirators remained at the Airbnb to monitor the police scanners and update the others about any police activity. Meanwhile, Johnson, Allen and other co-conspirators entered the backyard of Victim-2's home, and peered inside, coming close to breaking in, but ultimately deciding that it was too risky given that daylight was breaking. (PSR ¶ 16). The co-conspirators used a cellphone application that allowed them to share voice messages contemporaneously, akin to a walkie-talkie, and further allowed them to program the application so that messages were deleted upon their playback. (PSR ¶ 12).

In the early morning hours of May 23, 2020, Allen and his co-conspirators decided to finally execute their planned robbery. As practiced, some co-conspirators remained at the Airbnb to monitor police scanners and inform the others of any police activity. (PSR ¶ 17). Meanwhile, Johnson, Allen, and other co-conspirators, dressed in dark-colored clothing, packed the equipment, and drove to Victim-2's home. (*Id.*). While in Victim-2's backyard, Allen and his co-conspirators discussed how to disable the home's alarm without triggering it, and further discussed where and when to break into Victim-2's home. (*Id.*). Eventually, Allen broke a window and snuck into Victim-2's basement. (*Id.*). One of the co-conspirators cut the cord to Victim-2's security system, which triggered an alarm and individuals in Victim-2's home were awakened and called 911. (*Id.*). Allen became trapped in Victim-2's basement, while other co-conspirators fled. Johnson remained outside Victim-2's house, trying to find a way to distract Victim-2's family so that Allen would be able to escape. (*Id.*). Ultimately, law enforcement was

able to respond to Victim-2's home quickly and found and arrested Johnson, who was just down the street, and Allen, who was in Victim-2's basement. (*Id.*).

Law enforcement further found a backpack that Allen left in Victim-2's basement. Inside the backpack was a taser, a pellet gun resembling a 9mm handgun, and brass knuckles. (*Id.*). Law enforcement subsequently found and searched the car that Allen and his co-conspirators used to drive to Victim-2's home. Inside the car was a battering ram, bulletproof vests, two cans of pepper spray, and a flashlight.

## B. Procedural History

On May 24, 2020, Allen was charged by complaint with conspiring to commit a Hobbs Act robbery on or about May 23, 2020, in violation of Title 18, United States Code, Section 1951. On May 26, Allen was arraigned on the complaint and ordered detained. On July 21, 2020, Allen was indicted on the same count charged in the May 24, 2020 complaint, with the date of the charged conspiracy extended to from on or about May 20, 2020 to May 23, 2020 (ECF Doc. No. 1).

On April 7, 2021, Allen consented to the filing of a superseding information (the "Superseding Information"), which charged Allen with conspiring to commit Hobbs Act robberies from on or about May 7, 2020 to May 23, 2020, which encompassed the Brockton, Massachusetts and Irvington, New York planned robberies. (ECF Doc. No. 45). That same day, Allen appeared before Your Honor and pleaded guilty to the Superseding Information pursuant to a plea agreement with the Government.

## C. The Plea Agreement and the Applicable Guidelines Range

The plea agreement between Allen and the Government sets forth the calculation of the appropriate offense level under the United States Sentencing Guidelines ("USSG"). The applicable Guidelines manual is the manual in effect as of November 2018.

Because the defendant conspired to commit Hobbs Act robberies, the base offense level is 20, pursuant to U.S.S.G. § 2B3.1(a). Because the conspiracy involved the possession of dangerous weapons, including a heavyweight pellet gun that resembled a 9mm firearm, a taser and brass knuckles, an additional three levels are added pursuant to U.S.S.G. § 2B3.1(b)(2)(E). Because the intended loss amount was more than $9.5 million, an additional seven levels are added pursuant to U.S.S.G. §§ 2B3.1(b)(7)(H) and 2X1.1(a). Because the defendant accepted responsibility and entered a timely guilty plea, a three-level reduction applies, pursuant to U.S.S.G. § 3E1.1(a) and (b). Accordingly, the offense level is 27.

Because the defendant does not have a criminal history, the criminal history score is zero and the defendant is in criminal history category I. (PSR ¶ 55).

With an offense level of 27 and criminal history category I, the sentencing Guidelines range is 70 to 87 months' imprisonment.

The United States Probation Office ("Probation") calculated the same Guidelines range as the plea agreement and recommends a sentence of 60 months' imprisonment. (PSR ¶ 29-42, 84).

On June 22, 2021, Your Honor sentenced Allen's co-defendant, Jeffrey Johnson, to 60 months' imprisonment.

## D. Discussion

### 1. Applicable Law

As the Court is well aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings.  *Id.* at 596.  After that calculation, however, the Court must consider the seven factors outlined in Title 18, United States Code, Section 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, and the need to adequately deter criminal conduct and promote respect for the law.  *Id.* at 50 & n.6.

### 2. A Guidelines Sentence Is Appropriate in This Case

The Government respectfully submits that a sentence within the Guidelines range of 70 to 87 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.  In particular, the nature and circumstances of the offense, the need to promote respect for the law, and the need to assure both general and specific deterrence, all justify such a sentence.

As described above, the nature of Allen's conduct is incredibly serious, involving extensive planning and the intent to commit two violent robberies within the span of just two weeks.  Allen and his co-conspirators began by specifically identifying and targeting individuals that they believed had millions of dollars of Bitcoin.  They then arranged to travel significant distances with the intent to break into the homes of their identified victims.  In the first instance, Allen and Johnson traveled out-of-state to Massachusetts and in the second instance, they traveled over 300 miles from Rochester to Irvington, New York.  Thereafter, they spent multiple days scouting their targeted locations, visiting each of the families' homes multiple times, and taking photographs and videos.  This reconnaissance allowed Allen and his co-conspirators to best plan where they could break in and whether there were security systems that they needed to avoid or disable.  For the second planned robbery, Allen and his co-conspirators conducted their reconnaissance during both the day – so that they could have the best view of the home and its surrounding area – and the night – so that they could assess what conditions would be like at the time of the actual robbery.  And their plans included not only how to break into their victims' homes, but the violence they would inflict once inside.  Specifically, in connection with the second planned robbery, Allen and his co-conspirators had meetings where they discussed plans to tie up Victim-2's parents and spray them with pepper spray.  Meanwhile, they planned to threaten Victim-2 with the imitation firearm

and real knives and then beat him/her up and do "whatever was necessary," to force Victim-2 to divulge the code to his/her Bitcoin.

And particularly troubling is that Allen and his co-conspirators did not just discuss and prepare for their crimes, they came incredibly close to accomplishing their violent goals. After extensive preparations, they went to Victim-2's home around 3:00 a.m., wearing dark-colored clothing and carrying their equipment. They had co-conspirators monitor the police scanner and provide updates on any police activity, and they maintained constant contact with one another through their messaging application. And Allen went so far as to break one of Victim-2's windows and climb inside Victim-2's basement, all while carrying a backpack filled with dangerous instruments, including a taser, brass knuckles, and an imitation firearm. If not for the triggered alarm and Victim-2's family being awakened, Allen was fully prepared to execute on the plan to commit serious violence to force Victim-2 to provide the code to his/her Bitcoin.

Although law enforcement was able to thwart Allen and his co-conspirators before they could fully execute their plan, their conduct nonetheless has had serious consequences. As described in the Pre-Sentence Report, Allen and his co-conspirator's actions have significantly traumatized Victim-2 and his/her family, including young children who were in the home on the morning of Allen's break-in. (PSR ¶¶ 23-25). Not only did the family experience significant trauma when they were awakened in the middle of the night to learn that someone had broken into their basement, but the events of May 23, 2021 have continued to negatively impact the entire family. Allen's actions have fundamentally altered the family's sense of safety in their own home, family members have suffered from insomnia, and if a noise is heard at night, the children wake up in tears out of fright. (PSR ¶ 24).

The need for both specific and general deterrence further support a Guidelines sentence. Wit/h respect to specific deterrence, although this is Allen's first criminal conviction, his willingness to plan out and attempt to execute two serious robberies within the span of a couple of weeks is troubling.

With respect to general deterrence, a Guidelines sentence is appropriate to send the message to others that planning out and attempting to execute violent robberies will lead to serious sentences of imprisonment. In particular, the Government is aware of other individuals who have been the targets of other similar robberies focused on obtaining Bitcoin currency, and accordingly a serious sentence of imprisonment here can serve to deter further similar crimes. Finally, and relatedly, a Guidelines sentence is appropriate to reduce sentencing disparities amongst defendants convicted of Hobbs Act conspiracies.

### 3. Defense Counsel's Submission

Defense counsel asks the Court to impose a sentence substantially below the Guidelines due to the fact that Allen is only 23 years old, had a difficult childhood, suffered from substance abuse, and has experienced additional hardship from being in custody during the COVID-19 pandemic. Although these are factors that the Court can consider in imposing a sentence the Government respectfully submits that they do not justify imposing a below-Guidelines sentence in this case given the serious nature of Allen's conduct.

With respect to Allen's age and lack of criminal history, the Government respectfully submits that while Allen is young and does not have a criminal history, his actions in this case evidence a clear intent to commit serious violence that is deserving of a serious sentence of imprisonment, and the Guidelines appropriate account for Allen's criminal history.  The Government disagrees with defense counsel's assertion that Allen "did not have the resources or the inclination to conceive of or implement the scheme." (Def. Ltr. at 4).  While Allen may not have been the ultimate mastermind of the plan to break into two different people's homes and violently rob them of their Bitcoin, his desire and ability to implement this plan could not have been clearer.  As described above, Allen was an active participant in the many stages of planning, including multiple rounds of reconnaissance.  Allen also came prepared with the necessary equipment, packing his backpack with a taser, brass knuckles, and an imitation firearm.  And it was Allen who actually broke into Victim-2's basement.  In short, Allen was in the prefect position to fully execute the plan and very easily could have done so had Victim-2's security alarm not been triggered.  Allen may have been recruited by another person to participate in this conspiracy, but once recruited he was an eager and active participant.

The Government recognizes that Allen had a difficult childhood and has suffered with substance abuse issues, but respectfully submits that given the seriousness of Allen's conduct, these other factors do not justify imposing a below-Guidelines sentence here.

**E. Conclusion**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 70 to 87 months' imprisonment.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

by:  ___/s/ Courtney Heavey_____
     Courtney L. Heavey
     Assistant United States Attorney
     (914) 993-1927